UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA  DIVISION

UNITED STATES OF AMERICA

v.

TODD S. FARHA
THADDEUS M.S. BEREDAY
PAUL L. BEHRENS
WILLIAM L. KALE
PETER E. CLAY

CASE NO.   8:11-cr- *115-T-30MAP*
18 U.S.C. § 371
18 U.S.C. § 1035
18 U.S.C. § 1347
18 U.S.C. § 1001
18 U.S.C. § 982(a)(7)

## INDICTMENT

The Grand Jury charges:

## COUNT ONE
### (Conspiracy - 18 U.S.C. § 371)

### A. INTRODUCTION

At times material to this Indictment:

1.     The Medicaid program, as established by the Social Security Act, was a cooperative federal-state health care benefit program that enabled the states to furnish necessary medical benefits, items, and services to certain families and individuals (hereinafter "Medicaid program recipients") who were unable to meet the costs of the benefits, items, and services.  It was necessary for the states electing to participate in the Medicaid program to comply with the requirements imposed by the Social Security Act and regulations of the Secretary of the United States Department of Health and Human Services ("DHHS").

2.     The Centers for Medicare and Medicaid Services ("CMS"), previously known as the Health Care Finance Administration ("HCFA"), was an agency of the

DHHS, and was the federal governmental body responsible for the administration of the Medicaid program. CMS, in turn, authorized each state to establish a state agency to administer the Medicaid program component in that state. In Florida, the Medicaid program was administered by the Agency for Health Care Administration ("AHCA"), which divided the state into various operational Areas (or rate zones) to facilitate its administration of the program.

3.     The federal government reimbursed the states for a portion of the states' Medicaid expenditures based on a formula tied to the per capita income in each state. The federal share of Medicaid expenditures (otherwise referred to as "federal financial participation" or "FFP") varied from state to state. In Florida, the FFP equaled approximately 59% of the state's total Medicaid expenditures.

4.     Certain health care practitioners, health care facilities, and/or health care plans that met the conditions of participation and eligibility requirements and that were enrolled in the Medicaid program could provide or cover, and be reimbursed for providing or covering, Medicaid-covered services to Medicaid program recipients.

5.     There were several ways in which reimbursement was made to health care providers and plans, of which capitation reimbursement was one. Capitation reimbursement applied to health maintenance organizations ("HMOs") and certain other health care plans. Said HMOs and plans were paid a flat or "capitated" rate each month for each beneficiary or member enrolled in the HMO or plan to receive services under that HMO or plan. The capitated rate paid varied depending upon various factors, such as the relevant AHCA operational Area, age group, and gender.

2

6.    AHCA's Bureau of Managed Care had oversight responsibility for HMOs operating in Florida and was the bureau charged with administering AHCA's contracts with Florida Medicaid HMOs to provide services to Florida Medicaid program recipients.

7.    Generally, through its subsidiaries, Wellcare Health Plans, Inc. (formerly doing business as Wellcare Acquisition Company, and also known as WCG Health Management, Inc., referred to herein as "WELLCARE"), a legal entity created under Delaware law, operated HMOs in a number of states targeted to government-sponsored health care benefit programs, such as the Medicaid and Medicare programs.  In Florida, WELLCARE enrolled Medicaid program recipients into one of its two Florida Medicaid HMOs, Wellcare of Florida, Inc. (formerly known as Well Care HMO, Inc., and doing business as StayWell Health Plan of Florida, referred to herein as "STAYWELL") and Healthease of Florida, Inc. ("HEALTHEASE").  Both STAYWELL and HEALTHEASE were wholly-owned subsidiaries of WELLCARE and legal entities created under Florida law.

8.    AHCA contracts with Florida Medicaid HMOs executed before July 2002 ("pre-2002 Medicaid HMO contracts") included provisions that required the Florida Medicaid HMOs, including the HMOs STAYWELL and HEALTHEASE, to provide Florida Medicaid program recipients with an array of "Covered Services."  Said "Covered Services" included, among other categories of services, three categories of behavioral health care services:

(a) inpatient hospital care for psychiatric conditions;

(b) outpatient hospital care for psychiatric conditions; and

(c) psychiatric physician services.

3

9.      Two other categories of behavioral health care services, those being, the services listed in the Community Mental Health Services Coverage and Limitations Handbook ("CMHC services") and the Mental Health Targeted Case Management Coverage and Limitations Handbook ("TCM services") were, with certain exceptions, omitted, or "carved out," from the list of "Covered Services" in the pre-2002 Medicaid HMO contracts.  Thus, Florida Medicaid HMO members who required such outpatient CMH and/or TCM services received the services via a fee-for-service or other arrangement with AHCA.

10.      To govern certain aspects of the provision of Florida Medicaid program services, that is, behavioral health care services, to Florida Medicaid recipients, Florida Statute 409.912(3)(b) (later changed to Florida Statute 409.912(4)(b)) was enacted and effective in 2002, and read, in pertinent part:

> To ensure unimpaired access to behavioral health care services by Medicaid recipients, all contracts issued pursuant to this paragraph shall require 80 percent of the capitation paid to the managed care plan, including health maintenance organizations, to be expended for the provision of behavioral health care services.  In the event the managed care plan expends less than 80 percent of the capitation paid pursuant to this paragraph for the provision of behavioral health care services, the difference shall be returned to the agency.

11.      Following enactment of Florida Statute 409.912(3)(b) in 2002, Florida Medicaid HMOs were required by the AHCA Bureau of Managed Care to cover the full range of behavioral health care services: the three categories of behavioral health care services listed above in paragraph 8 plus the two categories of previously "carved out"

4

behavioral health care services, or CMH and TCM services, described above in paragraph 9.

12.     Pursuant to a rollout plan established by AHCA, the Florida Medicaid HMOs were initially required to cover the provision of CMH and TCM services in only AHCA operational Areas 1 and 6.  Said rollout plan further mandated that all Florida Medicaid HMOs eventually extend coverage for CMH and TCM services to the remaining Areas of Florida, beginning in 2005.  To compensate the affected Florida Medicaid HMOs for the provision of the additional CMH and TCM services, AHCA paid the HMOs an additional, or "add-on," premium capitation amount.

13.     For Florida Medicaid HMOs, the first AHCA contract term to be impacted by the enactment of Florida Statute 409.912(3)(b), was the contract term with an effective period from in or around July 1, 2002 through June 30, 2004 ("2002-2004 Medicaid HMO contracts").  Thus, 2002-2004 Medicaid HMO contracts between AHCA and Florida Medicaid HMOs -- including the Medicaid HMO contracts with the two WELLCARE HMOs STAYWELL AND HEALTHEASE -- included additional provisions, language, templates, and tables, relating to the provision of CMH and TCM services to Florida Medicaid program recipients by the HMOs.  Further, section 60.3.8 of the Medicaid HMO contracts included the following reporting and refund requirements for Florida Medicaid HMOs:

> Behavioral Health Care Expenditure Report (Annual Template Expenditure_MH.XLS)
>
> By April 1 of each year, plans with members in Areas 1 and 6 shall provide a breakdown of expenditures related to the provision of behavioral health care, using the spreadsheet template provided by the agency. Pursuant to Section 409.912(3)(b), F.S., 80 percent of the capitation paid

to the plan shall be expended for the provision of behavioral health care services. In the event the plan expends less than 80 percent of the capitation, the difference shall be returned to the agency no later than May 1 of each year.

14.     To facilitate the reporting of expenditures as required under section 60.3.8 of the relevant Medicaid HMO contracts, AHCA's Bureau of Managed Care provided each affected Florida Medicaid HMO, including the WELLCARE HMOs STAYWELL and HEALTHEASE, with a worksheet titled "Financial Worksheet For Comprehensive Behavioral Health Care," or other similar title (such worksheet is referred to herein as "Behavioral Health Care Worksheet"), that was organized in a manner to calculate and present to AHCA the HMO's expenditure information relating to the provision of CMH and TCM services and the amount of refund, if any, due AHCA under the contracts. The Bureau of Managed Care also drafted and sent a cover letter along with each Behavioral Health Care Worksheet that provided additional information and guidance to the HMOs concerning the worksheet, such as definitional language and the deadline for submission of the worksheet and any related refund to AHCA.

15.     In or about early June 2004, AHCA's Bureau of Managed Care sent two Behavioral Health Care Worksheets to each WELLCARE Florida Medicaid HMO -- STAYWELL and HEALTHEASE -- to be completed in accordance with the reporting and refund requirements of section 60.3.8 of the Medicaid HMO contracts.  Said worksheets covered two discrete time periods: July 1, 2002 through December 31, 2002, and calendar year 2003.  Thus, STAYWELL and HEALTHEASE were each required to complete and submit two Behavioral Health Care Worksheets to AHCA, one worksheet for the period beginning July 1, 2002 through December 31, 2002, and one worksheet for calendar year 2003.

6

16.     Each Behavioral Health Care Worksheet sent by AHCA to STAYWELL

and HEALTHEASE in June 2004 was sent under a cover letter that explained, in part,

the following:

> As a managed care plan providing behavioral health care services to
> Medicaid beneficiaries in Areas 1 or 6, your organization is subject to the
> requirements of Section 60.3.8 of the 2002-2004 Medicaid Contract. This
> reads, in part, as follows:
>
> > "By April 1 of each year, plans with members in Areas 1 and
> > 6 shall provide a breakdown of expenditures related to the
> > provision of behavioral health care, using the spreadsheet
> > template provided by the agency. Pursuant to Section
> > 409.912(3)(b), F.S., 80 percent of the capitation paid to the
> > plan shall be expended for the provision of behavioral health
> > care services. In the event the plan expends less than 80
> > percent of the capitation, the difference shall be returned to
> > the agency ... "
>
> For reporting purposes, behavioral health care services are defined as
> those services the plan is required to provide, as listed in the Community
> Mental Health and Targeted Case Management Services Coverage and
> Limitations Handbooks. As used above, expended means the total
> amount, in dollars, paid directly or indirectly to behavioral health providers
> for the provision of those required behavioral health care services.

17.     Thus, per section 60.3.8 of the Medicaid HMO contract and the related

Behavioral Health Care Worksheet, if the annual medical expenditures by a Florida

Medicaid HMO for the provision of TCM and CMH services to its members were less

than 80% of the related premium paid by AHCA to the HMO for delivering the CMH and

TCM services, the HMO was required to refund the difference to AHCA. Hence, each

Florida Medicaid HMO was required to pay an annual refund settlement to AHCA to

account for the amount of its behavioral health Medical Loss Ratio ("MLR") below 80%.

For this purpose, MLR was calculated by dividing medical expenditures by premium

received.  The Medicaid HMO contracts that included such reporting and refund requirements are also referred to herein as "Medicaid HMO 80/20 contracts."

18.     As explained in the June 2004 cover letters and specified in the accompanying Behavioral Health Care Worksheets, each participating Florida Medicaid HMO operating in AHCA Areas 1 and 6, including the WELLCARE HMOs STAYWELL and HEALTHEASE, was required to provide AHCA with true and correct expenditure information relating to the HMO's provision of CMH and TCM services to the HMO's members in Areas 1 and 6.  In the event the HMO expended less than 80 percent of the capitation paid to the HMO for the provision of the CMH and TCM services, the difference was to be refunded to AHCA.  In addition, the Behavioral Health Care Worksheets included a section at the bottom of the worksheets for the Chief Executive Officer or President of the relevant entity to sign, thereby swearing or affirming that the expenditure information reported to AHCA by the Florida Medicaid HMO was true and correct to the best of the signer's knowledge and belief.

19.     Medicaid HMO 80/20 contracts bearing like annual 80/20 reporting and refund requirements for Florida Medicaid HMOs were also in effect for contract periods 2004-2006 and 2006-2009.

20.     TODD S. FARHA began working at WELLCARE in or around August 2002.  During his employment with WELLCARE, FARHA served in the following positions and/or designations, among others: (1) President, Chief Executive Officer, Director, and Chairman of the Board of WELLCARE; (2) President and Director of HEALTHEASE, STAYWELL, and Harmony Behavioral Health, Inc. (f/k/a Wellcare

Behavioral Health, Inc., referred to herein as "HARMONY"); and (3) President and Chief Executive Officer of Comprehensive Health Maintenance Inc. ("CHMI").

21.     THADDEUS M.S. BEREDAY began working at WELLCARE in or around November 2002. During his employment with WELLCARE, BEREDAY served in the following positions and/or designations, among others: (1) Senior Vice President, General Counsel, Secretary, and Chief Compliance Officer of WELLCARE; (2) Secretary, Vice President, and Director of HEALTHEASE, STAYWELL, and HARMONY; and (3) Director and Vice President of CHMI.

22.     PAUL L. BEHRENS began working at WELLCARE in or about September 2003. During his employment with WELLCARE, BEHRENS served in the following positions and/or designations, among others: (1) Senior Vice President and Chief Financial Officer of WELLCARE; and (2) Chief Financial Officer, Treasurer, and Director of HEALTHEASE, STAYWELL, HARMONY, and CHMI.

23.     WILLIAM L. KALE began working at WELLCARE as an independent contractor and was hired as a WELLCARE employee in or around 2002. During his employment with WELLCARE, KALE served in the following positions and/or designations, among others: (1) Vice President of HARMONY, and (2) Vice President of Government and Regulatory Affairs.

24.     PETER E. CLAY began working at WELLCARE in or around April 2005. During his employment with WELLCARE, CLAY served as the Vice President of Medical Economics and reported to PAUL BEHRENS. As the Vice President of Medical Economics, CLAY supervised a number of WELLCARE employees, including Gregory West, Sean Hellein, and others.

## B. The Agreement

25.    Beginning in or about July 2003, and continuing until on or about October

24, 2007, at Tampa, in the Middle District of Florida, and elsewhere,

TODD S. FARHA,
THADDEUS BEREDAY,
PAUL BEHRENS,
WILLIAM KALE, and
PETER CLAY

defendants herein, together with Gregory West, knowingly and willfully did combine,

conspire, confederate and agree together and with various other persons both known

and unknown to the grand jury to:

(a)    defraud the United States out of money and property and by
impeding, impairing, obstructing, and defeating the lawful functions
of the DHHS, through its agency the CMS in the administration of
the Florida Medicaid program, by deceit, craft, and trickery; and

(b)    commit the following offenses against the United States:

(i)    in a matter involving a health care benefit program, that is,
the Florida Medicaid program, to knowingly and willfully
make a materially false, fictitious, and fraudulent statement
and representation, in connection with the delivery of and
payment for health care benefits, items, and services, in
violation of Title 18, United States Code, Section 1035; and

(ii)    to knowingly and wilfully execute and attempt to execute a
scheme and artifice to defraud the Florida Medicaid
program, a cooperative federal-state health care benefit
program, and to obtain, by means of false and fraudulent
pretenses and representations, money and property under
the custody and control of the health care benefit program,
in connection with the delivery of and payment for health
care benefits, items, and services, in violation of Title 18,
United States Code, Section 1347.

### C. Manner and Means

26.     The manner and means by which the defendants and others sought to accomplish the objects of the conspiracy included, among others, the following:

(a)     It was part of the conspiracy that, to falsely and fraudulently reduce WELLCARE's annual contractual refund obligations to AHCA under the Medicaid HMO 80/20 contracts, the conspirators would and did submit false and fraudulent expenditure information to AHCA relating to WELLCARE HMOs STAYWELL and HEALTHEASE, through the following acts and strategies:

i.     falsely and fraudulently including expenditures in Behavioral Health Care Worksheets that were expenditures made for services other than CMH and TCM services;

ii.     using a wholly-owned entity named HARMONY to conceal the true costs associated with providing CMH and TCM services and to falsely and fraudulently increase the expenditures reported to AHCA in Behavioral Health Care Worksheets;

iii.     falsely and fraudulently reporting to AHCA expenditures made by the WELLCARE HMOs to HARMONY in AHCA Areas other than Areas 1 and 6 as expenditures for HMO members receiving services in AHCA Areas 1 and 6;

iv.     including false, fraudulent, and misleading information in AHCA Behavioral Health Care Worksheets submitted to AHCA; and

v.     fraudulently certifying that the information contained in the AHCA Behavioral Health Care Worksheets was true and correct, knowing such was not the case.

11

(b)     It was further part of the conspiracy that, to avoid AHCA scrutiny, the conspirators would and did annually determine, report, and refund to AHCA a total combined amount for the WELLCARE HMOs approximating $1 million, rather than determining, reporting, and refunding to AHCA an amount calculated in accordance with AHCA's instructions and guidance.

(c)     It was further a part of the conspiracy that, in determining a total annual combined refund to AHCA approximating $1 million, the conspirators would and did utilize inconsistent methodologies across the various reporting periods.

(d)     It was further a part of the conspiracy that the conspirators would and did submit executed policies and procedures to AHCA that falsely and fraudulently represented to AHCA that Behavioral Health Care Worksheets would be completed and submitted to AHCA in accordance with AHCA's instructions and guidance.

(e)     It was further a part of the conspiracy that the conspirators would and did intentionally fail or refuse to directly and truthfully respond to AHCA's inquiries to the WELLCARE HMOs STAYWELL and HEALTHEASE to provide a detailed explanation to justify the wide variance between the MLRs reported to AHCA by the WELLCARE HMOs and the MLRs independently calculated by AHCA.

(f)     It was further a part of the conspiracy that the conspirators would and did provide certified Medicaid behavioral health encounter data and other information to AHCA that was false, misleading, and fraudulent.

(g)     It was further a part of the conspiracy that the conspirators would and did engage in multiple meetings, perform acts, and make statements, to promote

12

and achieve the objects of the conspiracy and to hide and conceal the purposes of the conspiracy and the acts committed in furtherance thereof.

### D. Overt Acts

27.     In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed by one or more of the defendants or other co-conspirators in the Middle District of Florida, and elsewhere:

(a)     In or about late September or early October 2003, defendant BEREDAY directed one attorney to stop all work related to the drafting of inter-company contracts between HEALTHEASE and HARMONY and between STAYWELL and HARMONY, and contacted another law firm to complete the contracts.

(b)     On or about December 19, 2003, defendant FARHA, then the President and Chief Executive Officer of STAYWELL, HEALTHEASE, and HARMONY, executed an agreement on behalf of STAYWELL with HARMONY (effective November 1, 2003) in which HARMONY agreed, in part, to arrange and manage the delivery of certain covered behavioral health services to STAYWELL's Medicaid program members in exchange for a monthly per-patient-per-month capitation fee of $7.90.

(c)     On or about December 19, 2003, defendant FARHA, then the President and Chief Executive Officer of STAYWELL, HEALTHEASE, and HARMONY, executed an agreement on behalf of HEALTHEASE with HARMONY (effective November 1, 2003) in which HARMONY agreed, in part, to arrange and manage the delivery of certain covered behavioral health services to HEALTHEASE's Medicaid program members in exchange for a monthly per-patient-per-month capitation fee of $7.04.

(d)     On or about July 20, 2004, defendant FARHA signed a Bureau of Managed Health Care, Financial Worksheet for Behavioral Health Care, on behalf of HEALTHEASE for calendar year of 2003, swearing or affirming that the TCM and CMH expenditure information reported was true and correct to the best of his knowledge.

(e)     On or about July 20, 2004, defendant FARHA signed a Bureau of Managed Health Care, Financial Worksheet for Behavioral Health Care, on behalf of STAYWELL for calendar year 2003, swearing or affirming that the TCM and CMH expenditure information reported was true and correct to the best of his knowledge.

(f)     In or about January 2005, defendants FARHA and KALE signed a corporate policy named Behavioral Health Medicaid Reports, purportedly applicable to HARMONY and WELLCARE HMOs STAYWELL and HEALTHEASE, concerning, in part, adherence to Section 60.3.6 of the Medicaid HMO 80/20 contracts.

(g)     On or about January 10, 2005, defendant KALE sent an email bearing several attachments, including a corporate policy named Behavioral Health Medicaid Reports, to an AHCA official.

(h)     On or about February 14, 2005, defendant BEHRENS sent an email to defendants FARHA, BEREDAY, KALE, and others, informing FARHA that BEHRENS was "on point for the completion of [the required] form," referring to the Behavioral Health Care Worksheets for STAYWELL and HEALTHEASE due to AHCA on April 1, 2005.

(i)     On or about June 18, 2005, defendant BEREDAY sent an email to defendant FARHA and another person bearing an attachment identified as "Behavioral Health 80-20 MLR Issuev3.ppt."

14

(j)     On or about March 22, 2006, defendant BEREDAY sent an email to another person advising him that as to the "80/20 Behavioral Health Issue," co-defendant FARHA wanted to rely mostly on defendants BEREDAY and BEHRENS.

(k)     On or about April 12, 2006, co-conspirator West sent an email bearing an attachment identified as "2006 Payback Analysis.xls" to defendant KALE and others that reflected three different payback calculations for the WELLCARE HMOs STAYWELL and HEALTHEASE for calendar year 2005, identifying potential refunds from the HMOs to AHCA that ranged from $0 to $11.9 million, depending solely upon the per-patient-per-month inpatient rate selected.

(l)     On or about April 28, 2006, defendant BEHRENS sent an email to defendant CLAY and another person, directing that new per-patient-per-month rates for the inter-company contracts between the WELLCARE HMOs STAYWELL and HEALTHEASE and HARMONY be provided to a WELLCARE senior corporate counsel so that the HARMONY agreements could be amended.

(m)     On or about May 1, 2006, co-conspirator West sent an email bearing an attachment identified as "HBH Cap Calc 2006.ZIP" to defendant KALE, and others, that specified the new per-patient-per-month rates to be used for the inter-company contracts between the WELLCARE HMOs STAYWELL ($12.27) and HEALTHEASE ($11.71) and HARMONY.

(n)     On or about June 13, 2006, defendant CLAY sent an email bearing an attachment identified as "2006 Payback Analysis 061206 summary.xls" to defendant BEHRENS that reflected nine different payback scenarios for the WELLCARE HMOs

15

STAYWELL and HEALTHEASE for calendar year 2005, identifying potential refunds

from the HMOs to AHCA that ranged from $0 to $11.3 million.

(o)     On or about June 14, 2006, defendant BEHRENS caused a

meeting to be scheduled between BEHRENS and defendant CLAY to discuss the nine

different payback scenarios presented in the "2006 Payback Analysis 061206

summary.xls" attachment, referred to immediately above.

(p)     On or about June 14, 2006, defendant CLAY told co-conspirator

West which method to use in calculating the calendar year 2005 refunds to AHCA from

the WELLCARE HMOs STAYWELL and HEALTHEASE under the relevant Medicaid

HMO 80/20 contracts.

(q)     On or about November 8, 2006, defendant BEHRENS, acting in his

capacity as Chief Financial Officer of HARMONY, and defendant BEREDAY, acting in

his capacity as General Counsel for STAYWELL, executed an agreement between

STAYWELL and HARMONY (effective January 1, 2006) in which HARMONY agreed, in

part, to arrange and manage the delivery of certain covered behavioral health services

to STAYWELL's Medicaid program members in exchange for a monthly per-patient-per-

month capitation fee.

(r)     On or about November 8, 2006, defendant BEHRENS, acting in his

capacity as Chief Financial Officer of HARMONY, and defendant BEREDAY, acting in

his capacity as General Counsel for HEALTHEASE, executed an agreement between

HEALTHEASE and HARMONY (effective January 1, 2006) in which HARMONY

agreed, in part, to arrange and manage the delivery of certain covered behavioral

health services to HEALTHEASE's Medicaid program members in exchange for a monthly per-patient-per-month capitation fee.

(s)      In or about January 2007, defendant CLAY stated to other WELLCARE employees, including defendant KALE and co-conspirator West, that the reason HARMONY existed was to hide profits from the state of Florida.

(t)      On or about February 6, 2007, defendant BEHRENS sent an email concerning "2006 Behavioral Health 80-20" to certain WELLCARE employees, including defendants KALE, CLAY, and BEREDAY, in which BEHRENS informed the recipients that he would "take point" on completing WELLCARE's Behavioral Health Care Worksheets for submission to AHCA.

(u)      On or about February 9, 2007, during a conversation, defendant BEHRENS reminded defendant BEREDAY how the calendar year 2005 refund submissions to AHCA had been calculated, to which BEREDAY replied: "Right."

(v)      On or about March 29, 2007, co-conspirator West, in explaining to another WELLCARE employee why a certain spreadsheet included multiple potential refund amounts to be repaid to AHCA, stated: "Because, you know how it is.  I mean, Paul [BEHRENS] and Todd [FARHA] they wanna see several options....  Regardless of what's legal or not, they want to see several options."

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FIVE
**(False Statements Relating to Health Care Matters - 18 U.S.C. §§ 1035 and 2)**

28.     On or about the dates set forth below in each count, in the Middle District

of Florida, in a matter involving a health care benefit program, that is, the Florida

Medicaid program,

Todd S. Farha,<br>
Thaddeus M.S. Bereday,<br>
Paul L. Behrens,<br>
William L. Kale, and<br>
Peter E. Clay,

defendants herein, aided and abetted by each other, and with others, including Gregory

West, did knowingly and wilfully make a materially false, fictitious, and fraudulent

statement and representation, in connection with the delivery of and payment for health

care benefits, items, and services, as reflected below in each count:

| Count | Dates | Defendant(s) | Conduct | Health Care Benefit Program |
|-------|-------|--------------|---------|------------------------------|
| TWO | June 2006 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for STAYWELL | Florida Medicaid Program |
| THREE | June 2006 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for HEALTHEASE | Florida Medicaid Program |
| FOUR | April 2007 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for STAYWELL | Florida Medicaid Program |

| Count | Dates | Defendant(s) | Conduct | Health Care Benefit Program |
|-------|-------|--------------|---------|------------------------------|
| FIVE | April 2007 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for HEALTHEASE | Florida Medicaid Program |

In violation of Title 18, United States Code, Sections 1035 and 2.

## COUNTS SIX THROUGH NINE
## (Health Care Fraud - 18 U.S.C. §§ 1347 and 2)

### A. Introduction

29.     The Grand Jury realleges and incorporates by reference the paragraphs contained in the Introduction section of Count One of this Indictment as though fully set forth herein.

### B. The Scheme

30.     During the periods specified in the table below in paragraph thirty-two, within the Middle District of Florida, and elsewhere, the defendants specified in the same table, with others, including Gregory West, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by materially false and fraudulent pretenses, representations, and promises.

### C. Manner and Means

31.     The substance of the manner and means of the scheme is described in paragraphs contained in the Manner and Means section of Count One of this Indictment, and the Grand Jury realleges and incorporates by reference those paragraphs as though fully set forth herein.

19

### D. <u>Execution of the Scheme</u>

32.     On or about the dates set forth below in each count, within the Middle

District of Florida, and elsewhere, for the purpose of executing and attempting to

execute the aforesaid scheme and artifice to defraud the specified health care benefit

program and to obtain, by means of false and fraudulent pretenses and

representations, money under the custody and control of the health care benefit

program, in connection with the delivery of and payment for health benefits, items, and

services, the specified defendants, aided and abetted by each other, and with others,

did knowingly and willfully engage in the conduct described in the count:

| Count | Dates | Defendant(s) | Conduct | Health Care Benefit Program |
|-------|-------|--------------|---------|-----------------------------|
| SIX | June 2006 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for STAYWELL | Florida Medicaid Program |
| SEVEN | June 2006 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for HEALTHEASE | Florida Medicaid Program |
| EIGHT | April 2007 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for STAYWELL | Florida Medicaid Program |
| NINE | April 2007 | Todd S. Farha, Thaddeus M.S. Bereday, Paul L. Behrens, William L. Kale, and Peter E. Clay | Submission of false and fraudulent CMH and TCM behavioral health care services expenditure information for HEALTHEASE | Florida Medicaid Program |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT TEN
## (False Statements - 18 U.S.C. § 1001)

33.     The Grand Jury realleges and incorporates by reference the paragraphs contained in the Introduction section of this Indictment as though fully set forth herein.

34.     On or about October 24, 2007, in Tampa, in the Middle District of Florida, in a matter within the jurisdiction of the executive branch of the Government of the United States,

### PETER E. CLAY,

defendant herein, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation to federal agents, to wit: that WELLCARE HMOs STAYWELL and HEALTHEASE had not over-reported outpatient behavioral health care expenditures to AHCA to reduce the refunds paid to AHCA, when in truth and in fact, as the defendant then and there well knew, the 2005 expenditures for outpatient behavioral health care services reported to AHCA by STAYWELL and HEALTHEASE in their relevant Behavioral Health Care Worksheets had been purposely over-reported in order to reduce the refunds paid to AHCA by the HMOs.

All in violation of Title 18, United State Code, Sections 1001.

## COUNT ELEVEN
### (False Statements - 18 U.S.C. § 1001)

35.     The Grand Jury realleges and incorporates by reference the paragraphs contained in the Introduction section of this Indictment as though fully set forth herein.

36.     On or about October 24, 2007, in Tampa, in the Middle District of Florida, in a matter within the jurisdiction of the executive branch of the Government of the United States,

PETER E. CLAY,

defendant herein, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation to federal agents, to wit: that WELLCARE HMOs STAYWELL and HEALTHEASE had not purposely inflated the costs associated with their behavioral health care encounter data submissions to AHCA when in truth and in fact, as the defendant then and there well knew, STAYWELL and HEALTHEASE purposely inflated the costs associated with behavioral health care encounter data submitted to AHCA in February 2007.

All in violation of Title 18, United State Code, Sections 1001.

## FORFEITURES

1.      The allegations contained in Counts One through Eleven of this

Indictment are hereby realleged and incorporated by reference for the purpose of

alleging forfeitures pursuant to the provision of Title 18, United States Code, Section

982(a)(7).

2.      Upon conviction of the conspiracy to violate Title 18, United States Code,

Sections 1035 and 1347, relating to a health care benefit program, charged in Count

One, committed in violation of Title 18, United States Code, Section 371, and the

substantive violations of:

     (a)      Title 18, United States Code, Section 1035, charged in Counts Two through Five;

     (b)      Title 18, United States Code, Section 1347, charged in Counts Six through Nine; and

     (c)      Title 18, United States Code, Section 1001, charged in Counts Ten and Eleven,

all of which relate to a health care benefit program, the defendants shall forfeit to the

United States of America, pursuant to Title 18, United States Code, Section 982(a)(7),

any and all right, title, and interest they may have in any property, real or personal, that

constitutes or is derived, directly or indirectly, from gross proceeds traceable to the

commission of the offenses, including but not limited to, a sum of money equal to the

amount of proceeds obtained as a result of such offenses.

3.      If any of the property described above, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL,

Foreperson

ROBERT E. O'NEILL
United States Attorney

Robert A. Mosakowski
Chief, Economic Crimes Section
Assistant United States Attorney

Jay G. Trezevant
Assistant United States Attorney

Cherie Krigsman
Assistant United States Attorney

FORM OBD-34
APR 1991

No.

# UNITED STATES DISTRICT COURT

Middle District of Florida
Tampa Division

## THE UNITED STATES OF AMERICA

vs.

TODD S. FARHA
THADDEUS M.S. BEREDAY
PAUL L. BEHRENS
WILLIAM L. KALE
PETER E. CLAY

**INDICTMENT**

Violations:
18 U.S.C. § 371
18 U.S.C. § 1035
18 U.S.C. § 1347
18 U.S.C. § 1001
18 U.S.C. § 982(a)(7)

A true bill,

_Patricia Nicholson_
Foreperson

Filed in open court this 2nd day of March 2011.

_____
Clerk

Bail  $_____

GPO 863 525