# Composite Exhibit B

```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION
                Case No. 8:11-cr-115-T-30MAP
```

**UNITED STATES OF AMERICA**

-vs-                                              8 April 2013
                                                   8:50 a.m.
**TODD S. FARHA,**                              Courtroom 13A
**PAUL L. BEHRENS,**
**WILLIAM L. KALE,**
**PETER E. CLAY,**

        Defendant.
_____/

VOLUME 51
DAILY-COPY TRANSCRIPT OF PROCEEDINGS
(JURY TRIAL)
**BEFORE THE HONORABLE JAMES S. MOODY, JR.,
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES
For the Government:     JAY G. TREZEVANT, ESQUIRE
                        CHERIE L. KRIGSMAN, ESQUIRE
                        Assistant United States Attorneys
                        United States Attorney's Office
                        400 North Tampa Street
                        Suite 3200
                        Tampa, Florida 33602
                        Phone: (813) 274-6000
                        Fax: (813) 274-6103
                        jay.trezevant@usdoj.gov
                        cherie.krigman@usdoj.gov

****PORTIONS OF TRIAL PROCEEDINGS TRANSCRIBED DURING AND FOR
USE DURING THOSE PROCEEDINGS MAY NOT BE READ TO THE JURY****

                        \* \* \* \* \*
*NOTE: ALL AUDIO AND VIDEO MATERIAL DISPLAYED WITHIN THIS
VOLUME ARE EXACT QUOTES OF BOTH WORD AND PUNCTUATION FROM
THE ORIGINAL TRANSCRIPTS PROVIDED TO THE COURT AND/OR JURY
AND HAVE NOT BEEN EDITED BY THE OFFICIAL COURT REPORTER.*
                        \* \* \* \* \*

*(appearances continued on next page)*

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

Sherrill L. Jackson, RPR, FPR
Official Court Reporter, U.S. District Court
Middle District of Florida, Tampa Division

```
 1  A    I'd say it started much earlier than that.
 2  Q    But it continued during this that period of time?
 3  A    Yes, sir.
 4  Q    Contracts and statutes, the words of those documents,
 5  have meaning in health care.  Would you agree?
 6  A    They do.
 7  Q    In fact, the Agency, AHCA, cannot ignore the plain
 8  meaning of a statute, can it?
 9            MR. TREZEVANT:  Objection, calls for legal
10  conclusion.
11            THE COURT:  Overruled.
12            THE WITNESS:  No, it cannot.
13  BY MR. LAURO
14  Q    AHCA also cannot ignore the plain meaning of a
15  contract, can it?
16  A    I certainly hope not.
17  Q    The words of a statute and the words of contracts are
18  meaningful because they limit the authority of government
19  officials, would you agree?
20  A    I would agree.
21  Q    In fact, words of a statute and words of a contract put
22  limitations on discretion that government officials have.
23  Would that be fair to say?
24  A    That's fair to say.
25  Q    We live in a society of laws; correct?
```

```
 1  A    That's correct.
 2  Q    Part of that means that public officials have to abide
 3  by those laws.  Would that be fair?
 4  A    It's more than fair.
 5  Q    Why is that, particularly in the administrative
 6  process?
 7  A    Well, it's for a couple of reasons.  One, you want to
 8  avoid basically arbitrary decisions and -- and regulations
 9  of the administrative branch, particularly without the
10  opportunity to challenge those rules, regulations, and their
11  underlying basis as fair --
12  Q    You -- I'm sorry, continue.
13  A    No, I'm sorry -- as fair and appropriate.
14  Q    You say "fair and appropriate."
15       Following what a statute says and what a contract says,
16  instills fairness in the system.  Would you agree?
17  A    I hope so.
18  Q    Why is that?
19  A    Because basically the laws reflect the collective will
20  of the Legislature, which they, in turn, are represented by
21  us when we vote.
22  Q    Rule-making also has an important role in that
23  function.  Would you agree?
24  A    It does.
25            MR. TREZEVANT:  Motion in limine.
```

1  opinion, but you can ask it again.
2           MR. LAURO:  Thank you, Your Honor.
3           *(Bench conference concluded.)*
4  BY MR. LAURO:
5  Q     All right, Mr. Clarke, we're back to the 80/20
6  amendment, the 80/20 statute, the language that we looked
7  at; correct?
8  A     Right.
9  Q     And we're now discussing your schematic and the fact
10 that Harmony's going to come into existence; correct?
11 A     That's correct.
12 Q     And it was anticipated that there might be payments
13 from the WellCare plans, the HMOs to Harmony; correct?
14 A     That's correct.
15 Q     Would it be accurate to say that there is nothing in
16 the 80/20 amendment itself that prohibits the WellCare HMOs
17 from including those payments to Harmony in connection with
18 the 80/20 reporting?
19 A     No, there's nothing specific like that.
20 Q     Now, with respect to the -- the formation of Harmony,
21 was your firm going to play any role in connection with this
22 company, this new company coming into existence?
23 A     I have no idea.
24 Q     Okay.  It's been a while ago.
25 A     We didn't -- the law firm did not have major legal

```
 1  BY MR. LAURO:
 2  Q    Let me show you this schematic that was given to AHCA.
 3  It's not exactly your schematic; correct?
 4  A    No.
 5  Q    But it's pretty darn similar.  Would you agree?
 6          MR. TREZEVANT:  Objection, speculation,
 7  foundation, competence.
 8          THE COURT:  Overruled.
 9          THE WITNESS:  Yes, it's close.
10  BY MR. LAURO:
11  Q    It shows the flow of funds and it shows how Staywell
12  and HealthEase were compensating Harmony; correct?
13  A    Yes.
14  Q    Were you aware that Mr. Sanders discussed with Mr. Shi
15  how Harmony --
16          MR. TREZEVANT:  Objection, Your Honor.
17  BY MR. LAURO:
18  Q    -- was being used in connection with the 80/20
19  calculation?
20          THE COURT:  Sustained.
21  BY MR. LAURO:
22  Q    All right, we can put that aside.
23       I'd like to go back to the statute for a moment.
24  Mr. Clarke, in your review of the statute and in review of
25  the 80/20 calculation, in the statute, the will of the
```

```
 1  Legislature, is there any restriction as to codes that can
 2  be used in the 80/20 calculation?
 3  A    No.
 4  Q    Is there any restriction as to place of location in
 5  connection with the 80/20 calculation?
 6  A    Not in this part of the statute, no.
 7  Q    Not in connection with the 80/20 calculation; correct?
 8  A    Right.
 9  Q    There's also no limitation that all services with
10  respect to 80/20 must be performed at community mental
11  health centers; correct?
12  A    Right.
13  Q    All right.  Now, we have discussed the statute but
14  there's also a contract between the AHCA entity, the State
15  of Florida, and managed care organizations; correct?
16  A    That's correct.
17  Q    What is the purpose of having a contract?
18  A    Well, the original purpose -- and I stress original
19  purpose going back into the 1980s -- was to have less
20  regulation of the HMOs -- and I don't mean less regulation;
21  I mean ways the -- the Medicaid agency was looking for ways
22  to incentivize health plans, that is, health insurers, HMOs,
23  to take Medicaid; and frankly, we had a terrible time
24  getting providers willing to step up to the plate.  The
25  first two Medicaid HMOs in the state were -- was the Palm
```

```
 1  Beach County Health Department.  At the time, I was a Deputy
 2  Director of the Health Department, statewide.  County Health
 3  Department in Palm Beach and Jackson Memorial Health Plan.
 4  We couldn't convince anybody else to do Medicaid for years.
 5  And later that all changed.
 6  Q    All right, but the purpose of a contract, would you
 7  agree, is to clearly establish what each party's rights and
 8  obligations are?
 9  A    Yes, and to do it in more expensive treatment than can
10  be done in a legislative enactment.
11  Q    Would you agree that the contract terms should be read
12  in a way that makes sense particularly if the words of the
13  statute are clearer -- the words of the contract are clear
14  and unambiguous?
15  A    Yes.
16  Q    I'd like to take a look at Defendant's 0128.118, which
17  is the 2002 contract, and we'll give you a copy of that.
18  A    You don't really have to.
19  Q    It's only about 5,000 pages.
20          MR. TREZEVANT:  Objection, Your Honor.
21          THE WITNESS:  Go ahead, I'm sorry.
22  BY MR. LAURO:
23  Q    All right, this is the 2002 contract.  If you want to
24  take a quick look.
25  A    Yes, it is the contract.
```

```
 1  Q    The contracts are changed every two years; correct, or
 2  at least back then that's what happened?
 3  A    Well, that was what was attempted.  They actually got
 4  changed virtually every year.
 5  Q    But in any event, for example, the 2002 contract would
 6  cover calendar year 2002 and 2003; correct?
 7  A    Correct.
 8  Q    And then the 2004 contract would cover calendar year
 9  2004-2005?
10  A    Right.  And '05-'06.
11  Q    Would be subsequent -- a subsequent contract in '06
12  would cover CY 2006 and CY 2007?
13  A    Yes.
14       MR. TREZEVANT:  Objection, Your Honor.  Is he
15  saying "calendar year"?
16       MR. LAURO:  Yes.
17       THE WITNESS:  I'm sorry.  These contracts are not
18  calendar year contracts; they're State fiscal year
19  contracts.
20  BY MR. LAURO:
21  Q    Got it.
22       Okay.  But for 80/20 reporting purposes, you look at --
23  A    The calendar.
24  Q    You look to the calendar year; correct?
25  A    Right.
```

1  Q     And you look to the calendar year where the contract
2  applies; correct?
3  A     Yes.
4  Q     All right.  So this is the 2002 contract covering, as
5  you've indicated, fiscal years.  But for the 80/20
6  calculation for CY 2002 and 2003, it would apply; correct?
7  A     Yes.
8  Q     And this is the 80/20 language that is applicable to
9  this contract.  And take a moment to refresh your
10 recollection.
11 A     Yes.  This --
12 Q     There's nothing in that contract that prohibits the
13 WellCare HMOs from using payments to Harmony in connection
14 with the 80/20 calculation; correct?
15 A     Correct.
16 Q     In other words, under the statute and the contract, if
17 the WellCare HMOs had contracted with another specialty
18 organization, let's say a Magellan or a CompCare, it could
19 include those payments in the 80/20 calculation; correct?
20 A     That's really speculative, but I think yes.
21        MR. TREZEVANT:  Objection, Your Honor,
22 speculation.
23        THE COURT:  Overruled.
24 BY MR. LAURO:
25 Q     Now, with respect to managed care organizations, the

```
 1  AHCA policymakers could have tried to include language in
 2  the contract that prohibited payments to companies like
 3  Harmony from being used in connection with the 80/20
 4  calculation; correct?
 5  A    Yes, that's correct.
 6  Q    But they never did -- or AHCA never did; correct?
 7  A    Correct.
 8  Q    But AHCA was certainly aware that companies like
 9  Harmony were routinely used in healthcare provision;
10  correct?
11  A    Yes, they were aware.
12  Q    Now, there's no reference to codes in this provision in
13  the contract; correct?
14            MR. TREZEVANT:  Objection, asked and answered.
15            THE COURT:  Overruled.
16  BY MR. LAURO:
17  Q    You can answer that.
18  A    That's correct.
19  Q    There's no limitation on service area or service
20  location; correct?
21  A    That's correct.
22  Q    There's no limitation on service provider; correct?
23  A    That's correct.
24  Q    Nothing in this provision that would say, you can only
25  count services provided at a community mental health center
```

```
 1  in connection with the 80/20 calculation; correct?
 2  A    That's right.
 3  Q    Now, the contract also allowed for subcapitation.  And
 4  I'd like to direct your attention to Defendants' 0128.26
 5  (changing overhead exhibit).  Do you see that (enlarging
 6  overhead display)?
 7  A    Hold on.  Give me a page number.  I'm not --
 8  Q    We've called it up for you.  It's page, I believe,
 9  2086.  Do you see that?
10  A    I do.
11  Q    Okay.  And certainly no secret to AHCA that entities
12  were contracting with behavioral healthcare organizations or
13  specialty organizations; correct?
14  A    Correct.
15  Q    All right.  Now, I'd like for you to take a look at
16  page 0128.135 (changing overhead exhibit), and there's a
17  glossary of terms, which you're very familiar with.  And to
18  speed the process, Mr. Clarke, we'll call it up for you, if
19  you take our word that's what it is.
20  A    All right.
21  Q    This is a behavioral healthcare provider.  And let's go
22  to behavioral healthcare services, the definition of
23  behavioral healthcare services.  Do you see that?
24  A    Yes.
25  Q    The contract defines behavioral health services very
```

```
 1  broadly, does it not?
 2  A    Yes, it does.
 3  Q    It doesn't limit it to codes, does it?
 4  A    No.
 5  Q    Location?
 6  A    No.
 7  Q    Or even community mental health centers; correct?
 8  A    That's correct.
 9  Q    In fact, was it your understanding of the contract that
10  the intent of AHCA was to allow managed care organizations
11  like WellCare to provide these services outside of the
12  community mental health centers?
13  A    As I testified before, there are -- it was divided
14  opinion in my -- my estimation among the staff.
15  Q    But according to the contract, what did the contract
16  say?
17  A    Well, the contract didn't say anything specific.  It
18  said, "Handle these problems, these emotion and mental
19  health disorders."
20  Q    But it didn't say where you had to handle them;
21  correct?
22  A    Nope.
23  Q    Part of the reason about having a managed care
24  organization is to provide that flexibility; correct?
25           MR. TREZEVANT:  Objection, asked and answered.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. LAURO:
 3   Q    Now, is there a downward substitution-of-care concept
 4   built into these contracts?
 5   A    I believe there is, but I can't point you to a specific
 6   place.
 7   Q    All right.
 8   A    Actually, downward substitution is, I believe, in the
 9   glossary, as well.
10   Q    I believe it is, as well.  If we can look at "downward
11   substitution" (enlarging overhead display).  We won't read
12   it out loud, but if you want to familiarize with --
13   A    Well, I'm familiar with it, and it is the section I was
14   talking about.
15   Q    But your argument to AHCA in connection with the 80/20
16   amendment is "WellCare provides upward substitution of
17   care"; correct?
18   A    Well, upward and downward.
19   Q    But certainly the upward should be counted just as much
20   as the downward?
21   A    Absolutely.
22           MR. LAURO:  Your Honor, this might be a good time
23   to break if it's acceptable to the court.
24           THE COURT:  All right, we'll recess for lunch
25   until 1:15.  Like I said, we're going to work until 6
```